## IN THE INTEREST OF: BABY BOY B (DOB: 3/19/91)

Case No. CJ 91-300225 JL-PC

Fifteenth Judicial Circuit, Palm Beach County

June 24, 1991

## OPINION OF THE COURT

HAROLD JEFFREY COHEN, Circuit Judge.

*ORDER OF PATERNITY DETERMINING ROBERT JOHNSON TO BE BIOLOGICAL FATHER OF BABY BOY B*

## ORDER DENYING AND DISMISSING PETITION FOR PERMANENT CUSTODY OF CHILD FOR PURPOSE OF SUBSEQUENT ADOPTION

## ORDER VACATING BIOLOGICAL MOTHER'S SURRENDER, CONSENT AND WAIVER OF NOTICE

## ORDER GRANTING CUSTODY OF CHILD TO BIOLOGICAL FATHER

## ORDER GRANTING REASONABLE VISITATION TO BIOLOGICAL MOTHER

## ORDER CONTINUING APPOINTMENT OF GUARDIAN AD LITEM PENDING FURTHER COURT ORDER, AND

## ORDER CONCERNING VISITATION PENDING APPEAL

THIS CAUSE came on to be heard before me upon the petition of Jan Cohn, Caseworker and Administrator of Adoption Services, Inc., a Florida not for profit corporation, d/b/a Chosen Children, seeking permanent custody of the child known as Baby Boy B (DOB: 3/19/91) for the purposes of subsequent adoption pursuant to Chapter 39, Florida Statutes. The petitioner seeks to terminate the parental rights of the child's biological parents in order to obtain permanent custody of the child to be adopted by Stephen Tilson and Sally Johnstone, a married couple of fourteen years residing in Boulder, Colorado.

Before proceeding further in the orders entered herein the Court places all parties, counsel, court personnel and other interested persons on notice concerning the following provisions of Florida law:

F.S. 39.408(2)(c) which states, in part:

. . . All hearings involving unwed mothers, custody, . . . or permanent placement of children shall remain confidential and closed to the public. . .

F.S. 39.471(3) which states, in part:

. . . The clerk shall keep all court records required by this part separate from other records of the circuit court. All court records required by this part shall not be opened to inspection by the public. All records shall be inspected only upon order of the court by persons deemed by the court to have a proper interest therein, except that, custodians of the child and their attorneys . . . shall always have

**115**

the right to inspect and copy any official record pertaining to the child. . .

F. S. 39.471(4) which states, in part:

. . . All information obtained pursuant to this part in the discharge of official duty by any judge, employee of the court, authorized agent of the department, or law enforcement agent shall be confidential and exempt from the provisions of F.S. 119.07(1) and shall not be disclosed to anyone other than the authorized personnel of the court, the department and its designees, law enforcement agents, and others entitled under this part to receive that information, except upon order of the court . . .

At the outset this Court states unequivocally that the decision made in this case was one of the most difficult this Court has had to make in its fifteen years on the bench. The last time such wording was placed in one of my court orders it was in a case where the Court felt compelled to sentence a criminal defendant to death. The Court clearly understands the gravity of its decision in this case and is truly sensitive to the feelings of all involved. The Court is absolutely heartsick to have to enter an order such as this one which will obviously devastate a wonderful, sincere, and caring lovely couple from Colorado who want so badly to raise Baby Boy B as their own "Ernie" and have done everything in their power thusfar to be wonderful and ideal parents. The Court is truly sorry that in a case such as this that such nice and warm people have to be hurt. It is only hoped that they will be able to "pick up the pieces" and some day make another more needy child the wonderful parents that they have been to Baby Boy B.

In the many cases cited by counsel in their research provided to the Court the learned appellate judges are often quoted and state that contested cases such as the one at bar are often the most difficult of all cases for trial judges. I certainly agree with that assessment and know that if we judges can feel so deeply about these cases that they must be almost unbearable for the parties involved.

In reaching its decisions in this case the Court has reviewed all the testimony and evidence presented including all exhibits actually introduced into evidence as well as those matters the Court had taken judicial notice of from its own file together with the Florida Statutes and case law provided to the Court by counsel—all of which have been filed in the official court file. The Court's findings of fact as recited below come from these sources as does its conclusions of law and ultimate orders entered herein.

At this juncture it is appropriate to note and emphasize that this

116

particular case is *not* an adoption case. The parties are before the Court on a petition to have Baby Boy B declared *dependent and permanently committed* to the custody of the petitioner thereby terminating the parental rights of *both* biological parents who were never married. Many of the authorities cited, especially by the petitioner, deal with *adoption* cases rather than termination of parental rights cases, i.e., matters raised pursuant to Chapter 63 of the Florida Statutes as opposed to Chapter 39 of the Florida Statutes. There are some major differences which will be referred to below.

First, the Court shall recite a history of the facts of this case from all matters presented:

[The mother], a twenty two year old woman of Hispanic decent, had an ongoing affair with Robert Johnson, a twenty three year old black man of Bahamian decent, during the mid part of last year, 1990. They had mutual contacts through the location of [mother's] employment. [Mother] knew Mr. Johnson's family members and spent some time at his home. There was even talk of marriage but no "formal" proposal and no marriage ever occurred. [Mother] was already the unwed mother of another female child who was less than a year old at that time. The father of [mother's] daughter was a man named Joe who she apparently was having a difficult relationship with. Joe came to see his daughter from time to time but had difficulties with [mother]. At one time Robert Johnson advised [mother] to obtain an injunction against domestic violence against Joe. [Mother] failed to act upon Robert Johnson's advice and at that point the relationship between Robert Johnson and [mother] began to deteriorate.

[Mother] then became concerned that she may be pregnant. She was unsure of her due date and of who the father was. Finally, by December, 1990 [mother] confirmed her pregnancy and, by calculating her due date, that Robert Johnson was the baby's father. Robert Johnson found out about [mother's] pregnancy and that he was the probable father. Robert Johnson then began showing up at [mother's] place of employment attempting to see her. [Mother] did not want to see Robert Johnson any longer. He tried to call her by telephone. She stopped taking his telephone calls.

Although the couple may have talked briefly about the possibility of an abortion it never received any serious consideration. Robert Johnson began to express his interest in the child and his desire to help support the child through intermediaries who he knew would speak on his behalf to [mother].

[Mother] simply was not interested. She never gave Robert Johnson

**117**

the opportunity to support the child and did not want much to do with him at all. [Mother] had gone to the petitioner believing that it would be in the child's best interest to be placed for adoption with a good family that could take care of its needs.

In her affidavit filed with the petitioner, and subsequently with the Court, [mother] alleged that Robert Johnson was moving to the Bahamas with his family and that she had not seen or heard from him. In essence, she lead the petitioner to believe that Robert Johnson was nowhere to be found and had no interest in the child. [Mother] knew better or should have known better. Robert Johnson continued to work at his regular job (where he has been for two years) throughout the entire time period. He still is at the job. Robert Johnson continued to reside in the same residence where [mother] had been with him throughout the entire period and where he still resides. [Mother] thought what she was doing would be in the child's best interest. She did not act from any evil intent but the lack of communication and/or misunderstanding related by [mother] to the petitioner is the core of the tragedy in this case.

[Mother] went to the hospital and gave birth to Baby Boy B on March 19, 1991. Robert Johnson learned of the birth "through the grapevine". He immediately took time from work to try to find his child. He went to two hospitals until he ascertained that the child was born and taken into the custody of the petitioner. The petitioner filed its pleadings on March 27, 1991. The child was sheltered by the petitioner after its release from the hospital for approximately two weeks and then placed with his *prospective* adoptive parents when Ms. Sally Johnstone came from Colorado to take Baby Boy B (whom she refers to as "Ernie") to Boulder, Colorado.

Ms. Johnstone and Mr. Tilson had worked with a Colorado child placement agency to obtain a child to fill a void in their fourteen year marriage. Ms. Johnstone and Mr. Tilson were assured that although they were taking the child on a "at risk" basis that in the hundreds of cases handled by the petitioner and the Colorado placement service that there was never a problem and that nothing would happen as has now happened in this case. They took Baby Boy B into their lives toward the beginning of April when he was about two weeks old pursuant to an interstate agreement sanctioned by the states of Florida and Colorado as related in the testimony of petitioner's caseworker. Baby Boy B remained in a nurturing comfortable environment with this wonderful and highly educated couple (a Ph.D. Child Psychologist and Professor, respectively) until the beginning of this month when they were required by court order to return Baby Boy B to this

118

jurisdiction and then to the custody of his biological father. Needless to say there have been a lot of heartfelt tears both inside and outside the courtroom during the course of these proceedings.

Meanwhile, back in Florida while Baby Boy B was thriving in the Johnstone/Tilson home, Robert Johnson was desperately doing everything possible to get custody of his son. He obtained an attorney at his own expense and on April 10, 1991 counsel for Robert Johnson filed his appearance in the case followed by a Motion to Intervene, Motion for Stay, Petition for Temporary and Permanent Custody and Motion for Injunctive Relief dated April 16, 1991 and filed with the clerk April 19, 1991.

The Court had previously scheduled the Petition for Permanent Commitment as an uncontested hearing for May 6, 1991. Said notice was filed on April 2, 1991 and a copy sent to Robert Johnson on April 8, 1991 when it became apparent he was trying to become involved in the case by coming to the Clerk's Office and finding out what to do. His attorney had not yet filed an appearance.

In addition, he attempted to file an acknowledgment of paternity with the Department of Health and Rehabilitative Services in West Palm Beach. His attempt was thwarted when the Department refused to accept his acknowledgment without the mother's signature. Later, he mailed an acknowledgment of paternity to the Department of Health and Rehabilitative Services, Office of Vital Statistics, at Jacksonville, Florida. The acknowledgment was dated April 16, 1991 and received by the Department of Health and Rehabilitative Services on April 18, 1991. All of this took place within a few weeks of Baby Boy B's birth.

Upon reaching court for a hearing in late April (approximately a month after the child's birth) Robert Johnson agreed immediately to a scientific paternity testing procedure. As set forth in Court's exhibit 1 in evidence (received by stipulation and agreement of all parties) Robert Johnson was and herein is determined to be the biological father of Baby Boy B. Probability of paternity was found to be 99.85 percent and nobody contests Robert Johnson is the biological father of Baby Boy B and the Court so finds.

There is no question in this case that Robert Johnson attempted as quickly and reasonably as possible to have his paternity and biological connection to Baby Boy B established by a court of law. There is no question that Robert Johnson attempted to acknowledge his paternity with the Department of Health and Rehabilitative Services in as short a time as is reasonably possible under the facts and circumstances of this case.

119

In fact, the Colorado child placement agency involved in these proceedings refused this Court's order to return the child to the State of Florida until the testing procedure set forth in Court's exhibit 1 in evidence was completed and conclusively determined that Robert Johnson was Baby Boy B's biological father.

Sensing the complicated and difficult issues arising in this proceeding the Court was quick to appoint a Guardian Ad Litem for Baby Boy B and quick to order an expedited social investigation (custody evaluation). The Guardian Ad Litem's Report to the Court and the social investigation (custody evaluation) have been received in evidence by the Court as Court's exhibits 2 and 3, respectively, over the objection of counsel, to certain portions, if not all, of these reports. These reports have been somewhat helpful but certainly not determinative of the outcome of this case.

The scenario described above are the facts as this Court finds them in attempting to make all the witnesses speak the truth. However, there was a "side" issue raised in the case that is disturbing to the petitioner and the Court. An attempt was made to show a motive in petitioner's case a large financial interest in its outcome. The Court specifically finds money *not* to be an issue in these proceedings. The petitioner performs a tremendous and useful service for society as a whole in working these types of cases. Under the testimony and evidence presented to the Court the petitioner is required to expend approximately $12,000.00 for the prenatal and birth expenses associated with delivering a child in today's expensive health care system. In this case the petitioner received a donation (or fee) of approximately $5,000.00 to $6,000.00. Since Baby Boy B is a "mixed race" or bi-racial child the policy of the petitioner is to place such a child on a "donation" basis. Ms. Johnstone testified that she paid the "almost $6,000.00" in order to cover the medical expenses of the biological mother in this case. Unbeknownst to her, she probably did not even cover half those expenses.

The petitioner's "usual" fee was *not* taken or collected in this case. Had Ms. Johnstone "donated" a far lesser sum than she did it would have made no difference in this child's placement.

Having made all of the above findings of fact the Court has applied the law under Florida Statute Chapter 39 and the case law cited as follows:

First, as noted above these proceedings are brought pursuant to Chapter 39, Florida Statutes and not Chapter 63, Florida Statutes. It is important to consider legislative intent for the juvenile justice system. Florida Statute 39.001(2)(e) states:

120

The purposes of this chapter are: . . . (e) To preserve and strengthen the child's family ties whenever possible, removing him from the custody of his parents only when his welfare or the safety and protection of the public cannot be adequately safeguarded without such removal . . .

It is against this legislative intent and purpose that all of Chapter 39 and this entire case must be considered.

Florida Statute 39.461(1) states, in part:

(1) All proceedings seeking an adjudication to terminate parental rights . . . shall be initiated pursuant to § 39.464.

Thus, we move on to Florida Statute 39.464 to determine the grounds for terminating parental rights. Florida Statute 39.464 states, in part:

. . . a licensed child—placing agency may petition for the termination of parental rights under any of the following circumstances: (1) VOLUNTARY RELINQUISHMENT.—The parent *or parents* have voluntarily executed a written surrender of the child and also consent to the entry of a court order giving custody of the child to . . . a licensed child - placing agency for subsequent adoption. The surrender document shall be executed before two witnesses and a notary public or other person authorized to take acknowledgments. A performance agreement or permanent placement plan need not be offered to the parent *or parents* and the petition may be filed at any time before a performance agreement on [sic] permanent placement plan has been accepted by the court. The surrender and consent may be withdrawn only when the court finds that the surrender and consent were obtained by fraud or duress. [Emphasis added.]

Furthermore, Florida Statute 39.467(2) states, in part:

The determination of the court regarding termination of parental rights shall be based upon its finding that the following is proven by clear and convincing evidence: (a) the child was adjudicated dependent pursuant to § 39.409 and . . . (b)2. Any of the elements of § 39.464 is met . . .

Petitioner seeks in this case an order adjudicating Baby Boy B to be dependent pursuant to Florida Statute 39.409. To find a dependency one must look to the definition of "Child who is found to be dependent" found in Florida Statute 39.01(10) which states, in part:

'Child who is found to be dependent' means a child who, pursuant

to this chapter, is found by the court:. . .(d) To have been voluntarily placed with a licensed child—placing agency for the purposes of subsequent adoption and a natural parent *or parents* have signed a consent pursuant to the Florida Rules of Juvenile Procedure. [Emphasis added.]

Therefore, if it is determined that both *parents'* consent is necessary to terminate parental rights the analysis ends here. Robert Johnson never consented to terminate parental rights and, indeed, was never even aware that an attempt to terminate parental rights was taking place until he reached the courthouse looking for his child.

A further review of Chapter 39, Florida Statutes may be somewhat helpful on whether the term "parents" includes an unwed father of the child. Florida Statutes 39.462 states, in part:

(1) Before the court may terminate parental rights, in addition to the other requirements set forth in this part, the following requirements shall be met: (a) Notice and copy of the petition shall be personally served upon the following persons, specifically notifying them that a petition has been filed: 1. The mother of the child. 2. The father of the child, if: . . . c. The child has been established by a court proceeding to be his child; d. He has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the child and has filed such acknowledgment with the Office of Vital Statistics of the Department of Health and Rehabilitative Services . . .

The Court has found in this very case and adjudicated in this very case Robert Johnson's paternity. It could not have been done by any reasonable stretch of the imagination much sooner than it was done in this case. In addition, Robert Johnson did acknowledge in writing signed in the presence of a competent witness that he is the father of Baby Boy B and filed that acknowledgment with the Office of Vital Statistics of the Department of Health and Rehabilitative Services in an acceptably reasonable period of time after the birth of the child, i.e., within one month. Robert Johnson has substantially complied with the requirements of Florida Statutes 39.462 and is entitled to notice of these termination proceedings.

Having notice of the proceedings, a right to appear and be a part of the proceedings, Robert Johnson must then be permitted to present evidence contesting a termination of parental rights.

As the Court has previously noted most of the cases cited by counsel in their research relate to *adoption* proceedings as opposed to termination of parental rights proceedings. Termination of parental rights

122

proceedings must be concluded to make a child *available* for adoption. Nevertheless, many of the principles set forth in the cases must be considered by this Court in its orders. The philosophy spills over into what the Court must do and has done in this case. For example, the United States Supreme Court in *Lehr v Robertson,* 363 US 248 (1983) stated:

> . . . The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to development [sic] a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent—child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interest lie . . .

In our case Robert Johnson has been attempting to do just what the United States Supreme Court says he needs to do in order to ". . . compel the State to listen to his opinion of where the child's best interest lie". Robert Johnson wants to support and raise his child. He has not laid back and waited for an adoption proceeding to go forward when Baby Boy B is one or two or three years old. Robert Johnson came forward almost immediately searching for Baby Boy B at the hospitals, the court, etc.

Under the current state of the law, petitioner's reliance upon *Clements v Banks,* 159 So.2d 892 (3rd DCA, 1964) is misplaced. First, as Robert Johnson has argued *Clements* is distinguishable from this case. There the Court dealt with a "putative" father—an alleged father. In our case we are dealing with an *acknowledged biological* father. Second, the holding in *Clements,* that ". . . for the purpose of determining matters within the juvenile court he is not considered as a parent . . ." cannot be good law today. *Clements* is a 1964 3rd DCA case which may have been somewhat persuasive in the 4th District in 1964 but cannot be followed in 1991 under the current state of the law set forth by the more recent cases.

Again, in *Lehr v Robertson,* 463 US 248 (1983) the United States Supreme Court stated:

> . . . The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases . . .

**123**

The Court went on to state:

. . . The institution of marriage has played a critical role both in defining the legal entitlements of family members and in developing the decentralized structure of our democratic society. In recognition of that role, and as part of their general overarching concern for serving the best interest of children, state laws almost universally express an appropriate preference for the formal family. In some cases, however, this Court has held that the Federal Constitution supercedes state law and provides even greater protection for certain formal family relationships. In those cases, as in the state cases, the court has emphasized the paramount interest in the welfare of children and has noted that the rights of the parents are a counterpart of the responsibilities they have assumed . . .

A more indepth view of the case law cited shows an increasing tendency in the law to allow the unwed parent a say in the rearing of a child when he has not sat back out of the picture for a substantial period of time doing nothing and not coming forward to rear a child. Robert Johnson simply seeks the opportunity to be a good father. Therefore, based on the scenario in this case that has occurred thusfar I find Robert Johnson does have a right to argue against termination and that the Court has a responsibility to determine the grounds for termination and the manifest best interest of the child, Baby Boy B pursuant to Florida Statute 39.467 which states, in part:

(1) In a hearing on a petition for termination of parental rights, the court shall consider the grounds for termination and the manifest best interest of the child. The need for termination of parental rights shall be established *by clear and convincing evidence.* [Emphasis added.]

(2) For the purpose of determining the manifest best interest of the child, the court shall consider and evaluate all relevant factors including, but not limited to: . . .

It is here that the scheme in Florida Statute 39.467(2) sets forth a "laundry list" of factors this Court must consider in determining the manifest best interest of Baby Boy B. In considering the need to terminate parental rights it is the petitioner's burden to show these needs have been proven by clear and convincing evidence. When evaluating all factors set forth in Florida Statute 39.467 taken in conjunction with the legislative intent and purpose of Chapter 39 as aforementioned it is obvious to the Court that petitioner has failed in its burden of proving to the Court by clear and convincing evidence the need to terminate parental rights in this case.

Florida Statute 39.467(2)(a) states that the Court must evaluate the ability and disposition of the parent or parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted by state law. In this case it is clear that Robert Johnson and his extended family have a clear ability to provide that which the statute requires. In fact, Robert Johnson's own mother, the child's biological paternal grandmother with whom the child will reside is a licensed nurse.

Florida Statute 39.467(2)(b) directs the Court to consider the capacity of the parent to care for the child to the extent that the child's health and wellbeing will not be endangered upon the child's return home. There is absolutely no evidence in the record whatsoever that the child's health and wellbeing will be endangered upon returning home to his biological father Robert Johnson. Again, the child's paternal grandmother will reside with the child as well and she is a licensed nurse.

Florida Statute 39.467(2)(c) directs the Court to consider the present mental and physical health needs of the child and his future needs to the extent that they can be ascertained based upon his present condition. Again, there is no evidence, certainly no clear and convincing evidence, to show that these needs cannot be made with his biological father Robert Johnson.

Florida Statute 39.467(2)(d) directs the Court to consider the love, affection, and other emotional ties existing between the child and the child's present parent or parents, etc. The Court is directed to determine the degree of harm to the child arising from the termination of parental rights. Here it is clear that the child who is now three months old will suffer minimal harm of the nature set forth in this subsection regardless of which family he lives with. Fortunately for Baby Boy B he is simply too young to suffer the degree of harm that an older child would suffer in the circumstances of this case.

Florida Statute 39.467(2)(e) is inapplicable and discusses an older child in foster care.

Florida Statute 39.467(2)(f) directs the Court to consider the child's ability to form a significant relationship with a parental substitute and the likelihood that the child will enter into a more stable and permanent family relationship as a result of permanent termination of parental rights and duties. It is this subsection of Florida Statute 39.467 that gives the Court the most difficulty. Clearly, Baby Boy B at three months old is unquestionably able to form a significant relationship with his parental substitutes, Ms. Sally Johnstone and Mr. Stephen

**125**

Tilson, who have already been described as an ideal married couple who would make wonderful parents for Baby Boy B in a stable and permanent family relationship. They have been married for fourteen years. They have been unable to conceive their own child despite trying all the latest medical techniques. They consider Baby Boy B to be "their son" and have loved him and cared for him in every way possible. They represent the "typical" nuclear American family and were about to have Baby Boy B their "Ernie", christened this month in their church. They are upper middle class people from solid American family backgrounds living a lifestyle that many of the authorities seem to indicate we should emulate. The child in this case would absolutely thrive in their environment.

However, Robert Johnson also comes from a close and caring family but from another culture. He comes from the extended black family with a single parent in the home living together with an extended support system including his mother, the child's paternal grandmother, a licensed nurse, and aunts and uncles who all "chip in" and care for each other. Stable employment is being held and an appropriate and attractive single family home is being provided. It may be more difficult to make ends meet but the emotional and physical needs of Baby Boy B will clearly be met. Although petitioner has urged the Court to consider the traditional American family beyond all other factors this Court simply cannot say that clear and convincing evidence has been offered to prove one family is "better" than the other. The Court is doing its best to keep its own personal prejudices and preferences out of this portion of the evaluation process. The Court simply cannot wholeheartedly embrace the somewhat elitist argument being advanced. The evidence in this area comes from the social investigation (custody investigation) and Guardian Ad Litem Report in addition to the testimony offered in open court. There are competing philosophies, to which this Court will grant equal dignity and respect, in where Baby Boy B's best interest lies—closer to his cultural and biological roots, or closer to the traditional American family configuration.

Florida Statute 39.467(2)(g) directs the Court to look at the length of time the child has lived in a stable, satisfactory environment and desirability of maintaining that continuity. Although the past two or three months may seem like an eternity to the parties involved in this action, it clearly is minimal compared to most other cases and this factor carries very little weight.

Florida Statute 39.467(2)(h) directs the Court to consider the depth of the relationship existing between the child and the present custodian.

126

Again, Baby Boy B just turned three months old. He resided in a shelter situation for approximately two weeks, he has lived with the Johnstone/Tilson couple approximately two months and with his biological father for several weeks. The depth of the relationships established again, although they may seem like "forever" to the parties, is not the depth of a relationship seen in cases involving years.

Florida Statute 39.467(2)(i) directs the Court to determine the preferences and wishes of the child. Obviously, a three month old child cannot express any such preference in this case.

Florida Statute 39.467(2)(j) directs the Court to consider the recommendations for the child provided by the child's Guardian Ad Litem or legal representative. It is clear in this case that the Guardian Ad Litem is recommending that Baby Boy B be returned to his biological father for the reasons stated in the record.

Florida Statute 39.467(2)(k) directs the Court to consider any suitable permanent custody arrangement with a relative of the child. Unquestionably, the permanent custody arrangement with the child's biological father in this case is appropriate under any stretch of the imagination.

Weighing all these factors and considering the heavy burden of proof required of the petitioner, that of clear and convincing evidence, to terminate parental rights, this Court finds that the burden has not been met and that is in the manifest best interest of Baby Boy B as set forth under Florida law and statutes to remain in the custody of his biological father, Robert Johnson, and that the petition for permanent custody seeking to declare Baby Boy B dependent and placing him with petitioner and subsequent adoption be denied.

It is also apparent from the testimony of the child's biological mother, that she only consented to a termination of her parental rights and adoption of her baby because she thought the baby would be placed for adoption in a good home with a married couple in a secure environment. Otherwise, she would not have consented. Therefore, this Court shall permit [mother] to withdraw her consent as she expressed in open court she wishes to do if the Court failed to terminate parental rights. However, [mother] also testified that she was unable to care for another baby at this time. Her daughter is now twenty months old and she remains an unwed mother who testified she was unable to care for another child at this time. There was absolutely no testimony in the record of her support system or ability to care for Baby Boy B. Although the Court will award custody of Baby Boy B to his biological father, Robert Johnson, [mother] may wish to exercise reasonable

**127**

visitation rights with her son and the Court will permit the same under the direction and guidance of the Guardian Ad Litem in this case. [Mother] may also wish in the future to move to modify the custody order being entered herein and may do so if she shows a substantial change in circumstances making such a modification in the manifest best interest of Baby Boy B,

It is therefore

ORDERED and ADJUDGED that petitioner's Petition for Permanent Custody for the Purpose of Subsequent Adoption be and the same is hereby denied and the petition is dismissed. It is further

ORDERED and ADJUDGED that Robert Johnson is hereby found and determined to be the biological father of Baby Boy B born March 19, 1991, and it is further

ORDERED and ADJUDGED that custody of Baby Boy B be awarded to his biological father, Robert Johnson. It is further

ORDERED and ADJUDGED that Baby Boy B's biological mother's surrender, consent, and waiver of notice, be and the same is hereby vacated and set aside. It is further

ORDERED and ADJUDGED that [mother], Baby Boy B's biological mother be given and may exercise reasonable visitation rights with her son, Baby Boy B to be arranged by and administered by the Guardian Ad Litem in this case. It is further

ORDERED and ADJUDGED that the Guardian Ad Litem in this case shall continue to monitor and represent the best interest of Baby Boy B and arrange any reasonable visitation deemed desirable and necessary and in the best interest of Baby Boy B with his biological mother, if she desires to exercise such visitation. It is further

ORDERED and ADJUDGED that all parties are hereby advised of their right to appeal this Court's orders entered herein pursuant to Florida Statute 39.473 which states:

(1) Any child, any parent, Guardian Ad Litem, or legal custodian of any child, any other party to the proceeding who is affected by an order of the court, or the department may appeal to the appropriate district court of appeal within the time and in the manner prescribed by the Florida Rules of Appellate Procedure . . .

Petitioner has already expressed its intention to appeal any denial of its petition in this cause. Therefore, if this Court has erred in the judgment entered herein and is ultimately directed to reverse its decision and grant the petition Baby Boy B would then be returned to

128

the permanent custody of the petitioner for subsequent adoption with the Johnstone/Tilson couple. Understanding the appellate process this Court knows that it may be at least several months before an ultimate decision is made in the appellate court. Therefore, in order to cause as little irreparable injury as possible pending the outcome of an appeal, the Court awards reasonable visitation rights to Mr. Stephen Tilson and Ms. Sally Johnstone, a married couple, with Baby Boy B if they wish to exercise those rights in the State of Florida during the pendency of the pending appeal. Any visitation rights so exercised shall be monitored by the Guardian Ad Litem in this cause as supervised visitation by the Guardian Ad Litem herself or an assigned member of the staff of the Guardian Ad Litem Office of the Fifteenth Judicial Circuit. Under no circumstances shall Baby Boy B be removed from the jurisdiction of this Court by any party for any reason without prior court order. Should the orders of this Court entered herein be affirmed on appeal those provisions granting rights of visitation to Mr. Stephen Tilson and/or Ms. Sally Johnstone shall be automatically vacated and set aside unless separately agreed to by the biological father Robert Johnson.

DONE and ORDERED this 24th day of June, 1991 in West Palm Beach, Palm Beach County, Florida.